## T. G. DUNCAN ET AL. v. STATE OF TEXAS.

Decided March 15, 1902.

**1.—State School Land—County Attorney—Authority to Sue for State.**

A county attorney, as such, has no authority to intervene in a suit for State school land, seeking to have the original purchase forfeited and to recover the land for the State on the ground that the purchaser had failed to reside on the land as required by law, since the statute confers such authority upon the Attorney-General alone. Rev. Stats., arts. 4218x, 42181.

**2.—Same—Sale Only Voidable—Right of Another to Purchase Before Forfeiture.**

Where a sale of school land is regularly made to an actual settler, it takes the land off the market until a forfeiture of the sale is declared, and a third person can not, by virtue of a subsequent rejected application to purchase, maintain trespass to try title for the land, and have a forfeiture declared because of the defendant purchaser's failure to continue his ocupancy for the required statutory period.

Appeal from Motley. Tried below before Hon. S. I. Newton.

*W. M. Smith, W. M. Pardue, G. E. Hamilton,* and *Files & Decker,* for appellants.

*Sumner Williams,* for appellee.

CONNER, CHIEF JUSTICE.—This action of trespass to try title was filed in the District Court of Motley County, Texas, on October 3, 1900, by appellant Walter E. Kimball, to recover from appellant T. G. Duncan all of sections Nos. 34, 36, 38, and 48, in block J B, in Motley County, Texas, surveyed for the public free school fund.

On August 14, 1901, C. S. Williams, county attorney of Motley County, Texas, filed his plea of intervention in behalf of the State of Texas, alleging that on November 10, 1897, William McHaley made his application to purchase the lands in controversy from the State of Texas as public free school lands, designating section 36 of said land as his home section, which application was in the form required by law, that said lands were thereupon awarded to said William McHaley, and that the said William McHaley and his assigns, by the contract above described, agreed and became legally bound to reside in good faith upon his home section for three years next after his purchase, and improve in good faith the land so purchased for three years next after his purchase; that on October 27, 1898, said William McHaley assigned all his rights under the aforesaid contract to the defendant T. G. Duncan, and that the defendant Duncan assumed all the obligations resting on the said McHaley under said contract, and agreed and became legally bound to do and perform all the acts which his assignor was bound to do under said contract; that the defendant did not continue to reside on said section 36, nor on either of the other sections so bought, for three years in good faith, but wholly failed to reside thereon, and abandoned said land, and failed to improve said lands for three years,

as he agreed and was bound to do, and failed to perform his aforesaid contract; wherefore intervener seeks to rescind said contract, and to recover the lands in controversy and all costs of suit from the defendant T. G. Duncan.

The appellant T. G. Duncan answered by plea of not guilty, and by special pleas setting up the McHaley purchase, and alleged full compliance with the law as McHaley's vendee, including three years actual and continued occupancy, of which final proof had been made.

On August 22, 1901, the court overruled the defendant's general and special exceptions, and the case was submitted to a jury and resulted in a verdict that the plaintiff Walter E. Kimbell take nothing by his suit, and that the defendant T. G. Duncan go hence without day, and that he recover of plaintiff all costs, etc., and that the State of Texas, intervener herein, recover of the defendant T. G. Duncan the four sections of land in controversy. From the judgment so rendered T. G. Duncan and Walter E. Kimbell have separately appealed.

The proven and admitted facts upon which this case depends are as follows: On September 21, 1897, the Commissioner of the General Land Office of Texas classified the four sections of school lands in controversy as dry grazing lands, and appraised them at $1 per acre, and on the same day notified the county clerk of Motley County, Texas, of such classification and appraisement, and said county clerk made a classification record showing said lands to be classified as grazing lands, and valued at $1 per acre. On November 10, 1897, William McHaley applied to purchase section 36 as an actual settler, and the other three sections as additional thereto, said applications being filed in the General Land Office November 13, 1897, and all four of the sections were awarded to him as grazing lands at $1 per acre on said applications, the sales dating November 13, 1897. His affidavits and obligations accompanying his said applications were in due form in every respect. On November 10, 1897, said William McHaley paid to the State Treasurer $64 as the first one-fortieth payment on the four sections of land in controversy, and he had on that date fully complied with the law with regard to settlement on his said home section 36, and he continued to reside thereon and comply with the law as an actual settler in good faith until October 27, 1898, when he transferred all the lands in controversy to the defendant T. G. Duncan. After he sold the land to the defendant Duncan he removed from it to Sweetwater, Texas. The deed from William McHaley to the defendant T. G. Duncan is dated October 27, 1898, and recites a consideration of $450. It is signed and duly acknowledged by William McHaley, as vendor, and T. G. Duncan, vendee, and is duly recorded in Motley County, Texas, and filed in the General Land Office of Texas November 3, 1898. On October 27, 1898, the defendant T. G. Duncan applied to purchase said section 36 as an actual settler, and the other three sections of the land in controversy as additional thereto, as assignee of said William McHaley, said application being filed in the General Land Office of Texas on November 3,

1898.   His affidavits and obligations accompanying his said applications were in due form in every respect.   On November 13, 1900, the defendant T. G. Duncan made his final proof of three years occupancy of his home section 36 by himself as principal, and C. H. Harper, T. N. Carmack, and D. E. McDonald, credible witnesses, showing "that William McHaley, the original purchaser of said land from the State, was, at the date of his purchase of said land, an actual settler in good faith, making his home thereon, and that from said date the said land has in good faith been occupied and resided upon continuously by said original purchaser and his vendee as a home for three consecutive years, and that said witnesses are not interested in said land."   This final proof was filed in the General Land Office November 16, 1900, and the Commissioner of the General Land Office issued to the defendant T. G. Duncan a certificate on November 17, 1900, showing that said proof was by him deemed sufficient.   The first one-fortieth principal and all interest payments on said lands were made by McHaley and Duncan as they became due, and their accounts are in good standing in the State Treasurer's office, and in the General Land Office of Texas.

On September 10, 1900, the plaintiff Walter E. Kimbell applied to purchase section 36 as an actual settler, and the other three sections of the land in controversy as additional thereto, said applications being filed in the General Land Office September 14, 1900, and each of said applications was indorsed on the back, "Rejected."   He applied to buy said lands as grazing lands at $1 per acre, and his affidavits and obligations accompanying his said applications were in due form in every respect.   On September 10, 1900, the plaintiff Walter E. Kimbell sent to the State Treasurer $64 to make the first one-fortieth principal payment required by law.

Motley County is within a judicial district having a district attorney, and the county attorney, Williams, relied upon testimony introduced by appellant Kimbell tending to show that appellant Duncan did not continuously reside upon his home section after his purchase from McHaley.   It was also admitted that the county attorney had no authority for his interveniion save such, if any, as is conferred upon him by the Constitution and laws as such officer.

We think we must sustain appellant Duncan's contention that the intervention in the name of the State, under the circumstances, was without authority.   No such authority is conferred upon a county attorney by legislative provision.   On the contrary the Legislature has specifically indicated its purpose that suits of the character presented here shall be instituted and maintained by the Attorney-General, or under his direction.   By article 4218, Revised Statutes (the school land law), the Governor is "authorized in his discretion to direct the Attorney-General to institute suit in the name of the State   *   *   *   for the recovery by the State of all lands sold under the provisions of this or former laws which have been or may hereafter be forfeited to the State

for any reason." Article 4218l expressly reserves the right of the State to enforce by suit forfeitures therein declared, and provides that such suits "may be instituted by the Attorney-General or under his direction in the proper court." Among other grounds of forfeiture declared in the article last cited is the very one that was urged in behalf of the State by the county attorney in this case—a failure "to reside upon and improve in good faith the land purchased." The power of the Attorney-General to so act has not been questioned, if, indeed, it could be. See Const., art. 4, sec. 22.

It is urged, however, that section 21, article 5, of the Constitution has conferred upon the county attorney the authority herein exercised, and that the Legislature is without power to divest such authority, the case of the State v. Moore, 57 Texas, 307, being cited in support of this contention. The article of the Constitution applying is as follows: "* * * The county attorneys shall represent the State in all cases in the district court and inferior courts in their respective counties; but if any county shall be included in a district in which there shall be a district attorney, the respective duties of district attorneys and county attorneys shall in such counties be regulated by the Legislature." Const,. art. 5, sec. 21.

It will be observed that the latter clause of the quotation imports an important qualification of the general power conferred upon the county attorney in the preceding clause. Motley County is within a judicial district having a district attorney, in which case, by the very article invoked in behalf of appellee, the Constitution relegates to the Legislature the power of defining the respective duties of the officers named. This, as may be seen from an inspection of the statutes on the subjject, the Legislature has carefully done, and in so doing has conferred no power upon the county attorney to institute a suit of the present character. See Rev. Stats., title 12. The term "duties" as used in the Constitution evidently also comprehends the further idea of power or authority. In other words, in the instance before us we must look to legislative act for the powers and authority of the county attorney, as well as for a definition of his duties. They are coextensive, and the county attorney has no authority to perform an act in respect to which no duty has been made to devolve upon him. Indeed the statute declares that "the duties and powers of district and county attorneys shall be such as are prescribed in this title (title 12) and in the Code of Criminal Procedure of this State." Rev. Stats., art. 287. Nor, if we measure the power of the county attorney by the first clause of the Constitution above quoted, regardless of its connected paragraph, as insisted upon, will it necessarily follow that county attorneys have the authority to institute a suit of this kind. It is not unreasonable to distinguish between the authority given to "represent the State in all cases in the district and inferior courts in their respective counties" that may be properly pending, and the power here asserted to inaugurate and institute certain important litigation. We see that the dis-

cretion and power involved in the institution of suits to forfeit charters of corporations has been committed to others than county or district attorneys. State v. Railway, 55 Texas, 76. So also as to suits to enforce penalties incurred under the railroad commission law of Texas (Moore v. Bell, 66 Southwestern Reporter, 45) ; while the power to institute as well as to maintain suits has been expressly provided in cases such as were involved in the consideration of State v. Moore, supra, Rev. Stats., art. 300. Article 7 of the Constitution dedicated a vast body of unappropriated public land, and thus provided a munificent fund devoted to the specific purposes of public education. This fund, so justly the subject of State pride and concern, has frequently been designated, as per force of the Constitution it must be, a trust fund. The Constitution provides that the lands so dedicated "shall be sold under such regulations, at such times, and on such terms as may be prescribed by law." Sec. 4, art. 7. Pursuant to this power the law-making body has enacted a complete system manifestly designed to effect the purposes of the constitutional dedication. The discretionary acts and powers involved in the care and disposition of the great domain so dedicated, and in the investment and distribution of the proceeds thereof, has undoubtedly been vested in heads of departments—members of the executive branch of our State government under the Constitution—whose duties are correlated, and the Legislature may well have foreseen that power conferred upon so large and so widely distributed a body of officers as county and district attorneys to institute suits to forfeit sales of school lands would be productive of confusion, uncertainty, and undue disturbance of titles. But whatever the cause, we think the Legislature has clearly evinced its purpose to not so place it, but on the contrary has conferred the power asserted by the county attorney in this suit upon that department of the State government so generally charged with the administration of our land laws.

These conclusions dispose of the main contention on this appeal. Appellant Kimbell has no title and no standing in this case unless the title of appellant Duncan be void, for the basis of his title is subsequent to that of Duncan and of Duncan's vendor. It is undisputed in the record that McHaley's purchase was regular, and that at the time of his application to purchase, November 11, 1897, and until his sale to Duncan, October 27, 1898, he was an actual settler on the land in controversy. So that the award to McHaley had the effect of taking the land off the market and it was not longer subject to sale until by proper proceedings in behalf of the State the sale to McHaley was forfeited because of abandonment on his part or on the part of his vendee. See O'Keefe v. McPherson, 2 Texas Court Reporter, 97, where this precise question was decided by us.

If we are correct in the foregoing views appellant Kimbell must fail in his suit, he being required as plaintiff to recover, if at all, upon the strength of his own title. Other questions therefore presented by assignments of error become immaterial and need not be discussed.

We conclude that as to appellant Kimbell the judgment should be affirmed with all costs of this court and of the court below taxed against him, but that the judgment in favor of the State should be reversed, and the suit in its behalf upon the intervention of the county attorney be dismissed without prejudice to the State's right, if any, to institute such suit or suits as may be deemed advisable on the part of the properly empowered officers.

*Affirmed in part; reversed and remanded in part.*

Hunter, Associate Justice, did not sit in this case.